IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHARLES S.**[1]

       **Plaintiff,**

  v.                            Civil Action 2:22-cv-3819
                                   Judge James L. Graham
                                   Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF**
**SOCIAL SECURITY,**

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Charles S., brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 10), Plaintiff's Reply (ECF No. 11), and the administrative record (ECF No. 7). For the reasons that follow, the Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and The ALJ under Sentence Four of § 405(g).

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

I. BACKGROUND

Plaintiff filed his current[2] applications for DIB and SSI on March 16, 2016, alleging that he has been disabled since October 18, 2013, due to Schizoaffective Disorder, Generalized Anxiety Disorder and Depression. (R. at 699-711, 837.) Plaintiff's applications were denied initially in April 2016 and upon reconsideration in December 2016. (R. at 368-420.) Plaintiff sought a de novo hearing before an administrative law judge. (R. at 467-88.) Plaintiff, who was represented by counsel, appeared and testified at a video hearing held on August 14, 2018. (R. at 327-48.) A vocational expert ("VE") also appeared and testified. (*Id.*) On October 19, 2018, Administrative Law Judge Kevin Plunkett ("ALJ Plunkett") issued a decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 421-41.) The Appeals Council granted Plaintiff's request for review and remanded the matter for further proceedings. (R. at 442-46.)

On remand, the claim was assigned to ALJ Noceeba Southern ("ALJ Southern"). After a telephone hearing held on September 16, 2021, ALJ Southern concluded Plaintiff was not eligible for benefits because he was not under a "disability" as defined in the Social Security Act. (R. at 256-287, 288-321.) The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 2-8.) This matter is properly before this Court for review.

---

[2] Plaintiff previously applied for disability benefits multiple times which were ultimately denied. (*See* R. at 352, 369.)

## II. RELEVANT PROCEDURAL HISTORY AND RECORD EVIDENCE

### A. Procedural History

As previously described, Plaintiff applied for disability benefits in 2016. A hearing was held on August 14, 2018 before ALJ Plunkett who later denied Plaintiff's claim. Plaintiff requested Appeals Council review of that decision and the Appeals Council granted the request. While reviewing ALJ Plunkett's decision, the Appeals Council identified multiple items of reversible error. (R. at 443-46.) First, the Appeals Council found a lack of support in the ALJ's mental health findings, specifically noting that the decision does not explain why Plaintiff could have an increase in contact with supervisors compared to a previous decision. (*Id.*) The Appeals Council additionally found that the ALJ applied the wrong rules and regulations to the opinion evidence of record, noting that the ALJ should give further consideration to Dr. Wolfgang's report when evaluating his opinion. (*Id.*) Lastly, the Appeals Council noted that there is additional evidence in the record that should be considered when developing Plaintiff's residual functional capacity. (*Id.*) Considering these errors, the Appeals Council remanded Plaintiff's claim for further development and analysis. (R. at 444-45.)

A second hearing was held on September 16, 2021 by ALJ Southern. (R. at 288-321.) On September 28, 2021, Plaintiff's claim was denied for a second time. (R. at 256-87.) The Appeals Council denied review. (R. at 2-8.) This appeal followed.

### B. Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as follows:

[D]uring the hearing, [Plaintiff] did not require questions to be repeated, and he appropriately answered questions that were presented to him.

3

(R. at 265 (internal citations omitted).)

> During the hearing, he testified that in the past he experienced depression as he was unable to find a job, stress prevents him to be able to work on a full-time basis, and he testified that he has experienced panic attacks.

(R. at 268. (internal citations omitted).)

### C. Relevant Medical Records

The ALJ summarized the medical records as to Plaintiff's mental health[3] treatment as follows:

> Shortly after the alleged onset date, on January 22, 2014, [Plaintiff] presented for an Annual Examination; he was noted to have recently been diagnosed with Bipolar Depression and was being treated with prescribed medication. During a physical examination, grossly normal findings were noted, including a normal gait, except he was noted to have significant stiffness with range of motion of the lower extremities. His diagnoses included Bipolar Depression. ***
>
> The record documents [Plaintiff] was hospitalized from July 22, 2015 until July 23, 2015 after seeking treatment with complaints of chest pain, which he described as sharp in nature and radiating up into his neck and jaw area. A physical examination revealed normal findings, except he was noted to have some mild tenderness of the chest. Upon discharge, his diagnoses included Chest Pain. Bipolar Disorder, and Depression.
>
> *** Moreover, during late 2015 and early 2016, [Plaintiff] attended individual psychotherapy sessions and community psychiatric supportive treatment at Muskingum Counseling Center. During his sessions, he expressed concerns about his son's medical issues; additionally, he discussed spending time with his children and his relationship with his ex-wife.

---

[3] Because Plaintiff's Statement of Errors, ECF No. 8, pertains only to his mental health issues, the Undersigned's discussion is limited to the same.

During a medication management visit on August 27, 2015, his associations were noted to be loose, flight of ideas were noted, visual and auditory hallucinations were noted, he was noted to have impaired attention span/distractibility, but his judgment was noted to be intact, and no apparent impairment of memory was noted. Thereafter, on September 29, 2015, his psychiatric findings were within normal limits.

Further, during mental health treatment on December 31, 2015, [Plaintiff]'s thought processes were noted be clear and linear, his judgment and insight were noted to be intact, and his attention span and concentration were noted to be within normal limits. Moreover, the record notes that he is treated conservatively with prescribed medication. Similar psychiatric findings were noted on March 29, 2016 and June 30, 2016, but his mood and affect were noted to be blunt and depression/sadness respectively. He was diagnosed with Schizoaffective Disorder and Generalized Anxiety Disorder. The above-summarized evidence of [Plaintiff]'s mental health treatment supports the mental limitations found within the above-stated RFC, including the social interaction limitations and the finding that he would be off task for 15 minutes in increments of 2 to 3 minutes at a time, as the record documents continued treatment for depressive and anxiety symptoms.

[Plaintiff] sought treatment with complaints of sleep problems on June 27, 2016. His diagnoses included Sleep Disorder. Further, he presented for a sleep medicine evaluation on July 14, 2016 and an associated physical examination revealed grossly normal findings. He was diagnosed with conditions including witnessed Sleep Apnea, Nocturnal Gasping, Snoring, Non-restorative Sleep, Daytime Tiredness, Obstructive Sleep Apnea, Parasomnia - nocturnal limb movements, and Schizoaffective Disorder. Thereafter, he presented for an overnight sleep study on July 25, 2016 and was diagnosed with Obstructive Sleep Apnea. This diagnosis was also noted on July 28, 2016. ***

Further, during July 2016, [Plaintiff] presented for an individual counseling session and discuss his concerns about his son's legal problems. Thereafter, on August 23, 2016, he discussed similar concerns and the custody agreement with his wife. In September 2016, the record documents [Plaintiff] was treated with CPAP therapy. Next, on September 22, 2016, September 29, 2016, and December 27, 2016, his psychiatric findings were within normal limits. He was diagnosed with Schizoaffective Disorder and Generalized Anxiety Disorder. Thereafter, on October 10, 2016 and December 12, 2016, the record notes that he continued to be treated with CPAP therapy.

In early 2017, the record documents [Plaintiff]'s psychotherapy sessions at Allwell Behavioral Health Services for diagnosis of Schizoaffective Disorder and Generalized Anxiety Disorder. On March 29, 2017, he discussed helping a friend move into a new apartment, as part of a community outreach effort through his church. Additionally, he discussed attending the retreat with members of his church. In April 2017, he discussed concerns regarding his children. Additionally, he reported that he enjoyed attending the Men's Retreat with his church. Moreover, the above-summarized evidence supports the social interaction limitations found within the above-stated RFC, as the record supports the notion that [Plaintiff] can appropriately interact with others.

\*\*\*

Further, during mid-2017 through early 2018, the record documents [Plaintiff]'s psychotherapy sessions at Allwell Behavior Health Services, due to diagnoses of Schizoaffective Disorder and Generalized Anxiety Disorder. In September 2017, [Plaintiff] reported that he was ready to work and wanted to work on finding a job. Moreover, the record notes that the associated psychiatric examination findings were within grossly normal limits, except, at times, his mood and affect was noted as blunted and depression/sadness.

\*\*\*

Moreover, during mid-2018, the record documents [Plaintiff]'s psychotherapy sessions at Allwell Behavioral Health. In April 2018, he discussed his lack of contact with the children. On June 11, 2018, he reported that he continued to struggle with anxiety, but he reported that he had not had a panic attack in 3 months. Moreover, on June 12, 2018, he reported that he felt less depressed and less anxious, after a medication was added to his treatment regimen. Notably, his psychiatric findings were noted to be grossly within normal limits, except the suppression/sadness was noted, regarding his mood and affect. Further, his psychotherapy treatment records from mid-2018 document the diagnoses and treatment of Schizoaffective Disorder and Generalized Anxiety Disorder. Specifically, during a psychiatric examination on September 11, 2018, the clinical findings were within normal limits, but, regarding his mood and affect, depression/sadness was noted.

> In addition, from late 2018 to late 2019, the record documents [Plaintiff]'s mental health medication management visits at Allwell Behavioral Health for the diagnoses and treatment of Schizoaffective Disorder and Generalized Anxiety Disorder. On December 4, 2018 and February 28, 2019, he reported that he was "doing good with his medications" and his mood was noted as stable; no hallucinations or paranoia were endorsed. Moreover, he was noted as working at McDonalds and reported that he liked it. His psychiatric findings were within normal limits. However, on May 16, 2019, he reported having increased anxiety and depression; additionally, he reported that his thoughts were racing very fast. Notably, on this date, his psychiatric findings were grossly normal, except, regarding his mood and affect, depression and sadness were noted. Thereafter, during 2019, his psychiatric findings were within normal limits or grossly within normal limits.
>
> \*\*\*
>
> Regarding [Plaintiff]'s mental health impairments, during 2020 and early 2021, the record documents mental health treatment and medication management at Allwell Behavioral Health Services for diagnoses of Schizoaffective Disorder and Generalized Anxiety Disorder. The associated psychiatric examinations conducted revealed findings within normal limits. On February 4, 2021, he reported that he was resting well, and his daytime mood and energy were noted to be stable. Next, on March 22, 2021, he reported that he felt his anger management skills had improved, and his overall mood was trending in a positive direction.
>
> Thereafter, in May 2021, he reported that he continued to do pretty good with medications and his mood was stable. Further, he reported that he was resting adequately, and his anxiety is controlled with the prescribed medication. Finally, in August 2021, he again reported he was doing good with his medications, and he reported his working extra shifts at Roosters, but it was stressful; however, he reported he was allowed extra breaks to stay calm. An associated psychiatric examination revealed findings within normal limits. Further, the record documents [Plaintiff] continued to be treated conservatively with prescribed medications. The above-noted diagnoses were continued.

(R. at 268-73 (internal citations omitted).)

In his Statement of Specific Errors, Plaintiff provides a more robust description of his mental health history and treatment:

[Plaintiff] received mental health services from Allwell Behavioral Health Services (hereinafter "Allwell") for over ten years. Tr. 1614. As part of his treatment at Allwell [Plaintiff] regularly received medication management and individual counseling. Id. His treatment notes from Allwell listed his problems as "anxiety and depression that interfere with day-to-day functioning, isolation, fear of crowds, indecisive, awkward in social settings fear of rejection." Tr. 1623. His psychiatrist at Allwell was Dr. Roger Balogh, M.D., and he diagnosed [Plaintiff] with schizoaffective disorder and generalized anxiety disorder. Tr. 1027. [Plaintiff]'s primary care physician, Dr. Michael Zimmerer, M.D., also treated [Plaintiff]'s mental health issues and diagnosed him with bipolar depression. Tr. 983.

On February 2, 2016, Dr. Zimmerer treated [Plaintiff] for complaints of shakiness and tremors. Tr. 982. Dr. Zimmerer attributed [Plaintiff]'s tremors to anxiety and observed that "he particularly seems stressed out when he is around other people." Id. Dr. Zimmerer prescribed [Plaintiff] Propranolol at this appointment. Id. Dr. Roger Balogh saw [Plaintiff] on March 29, 2016. Tr. 1020. Dr. Balogh reported that [Plaintiff] experienced depression, shakiness, and tremors, and was easily crying three times a day. Id. Additionally, Dr. Balogh noted that [Plaintiff] attempted to work at C.O.R.E. (Allwell's vocational program) but "had a panic and got tearful." Id. Dr. Balogh adjusted [Plaintiff]'s medication by increasing his Trileptal (oxcarbazepine). Tr. 1025-26.

At that time [Plaintiff] was also taking Abilify (aripiprazole) and Celexa (citalopram) to treat his schizoaffective disorder. Id. Three months later, in March 2016, Dr. Balogh examined [Plaintiff] and indicated his symptoms were worsening. Tr. 1223. Dr. Balogh increased [Plaintiff]'s Abilify prescription. Tr. 1230.

On January 13, 2017, Dr. Zimmerer increased [Plaintiff]'s propranolol prescription again due to his shakiness. Tr. 1362-63. In March 2017, [Plaintiff] saw Dr. Zimmerer again with complaints of shakiness and Dr. Zimmerer opined that this symptom was related to his anxiety. Id.

In May 2017, Dr. Balogh treated [Plaintiff] and observed that he was more anxious and restless during the daytime and described visual and auditory hallucinations. Tr. 1546. [Plaintiff] appeared restless and agitated and was depressed with a blunted mood. Id. Dr. Balogh increased [Plaintiff]'s Abilify prescription again. Tr. 1552. A month later in June 2017, [Plaintiff] reported to his therapist, Sherry Coulter, L.P.C.C., that he was suicidal and homicidal. Tr. 1555. She reported he was anxious, depressed, experiencing visual hallucinations and disoriented to time. Tr. 1556. As a result, she created a crisis plan for [Plaintiff] that included admission to the hospital. However, all the psychiatric wards were full, so she sent him to the emergency department to wait for a bed. Id. [Plaintiff] was subsequently admitted to the emergency room for this mental health crisis. Tr. 1477-78.

Shortly after this crisis, Dr. Balogh treated [Plaintiff] and noted that despite the increase in Abilify, he "continue[d] to have auditory hallucinations and voice[s] talking to him." Tr. 1564. Dr. Balogh prescribed another increase in Abilify at this time. Tr. 1569. In August 2017, Dr. Balogh noted that [Plaintiff]'s hallucinations were reduced to intermittent. Tr. 1574. In November 2017, Dr. Balogh reduced [Plaintiff]'s Abilify prescription in hope to help his tremor but noted that he would increase it if the hallucinations returned. Tr. 1589.

In February 2018, Dr. Balogh treated [Plaintiff] for complaints of worsening depression and anxiety. Tr. 1597. Dr. Balogh prescribed [Plaintiff] Rexulti in addition to his other psychiatric medicines. Tr. 1604. A day later, [Plaintiff] reported in group therapy that he was depressed, nervous, overwhelmed, and experiencing hallucinations. Tr. 1608. In March of 2018, [Plaintiff] continued to struggle with the same issues. Tr. 1618. In June of 2018, Dr. Balogh's treatment notes indicate [Plaintiff] continued to deal with chronic anxiety and weekly panic triggered by going out in public. Tr. 1690. Dr. Balogh increased [Plaintiff]' prescription for Rexulti. Tr. 1696.

In May 2019, Dr. Balog changed [Plaintiff]' medications again, adding venlafaxine and hydroxyzine, Tr. 1801, due to Mr. Sheet's increased anxiety and depression. Tr. 1785. A month later, Dr. Balogh noted [Plaintiff]' symptoms had worsened to the point where he was struggling to function and Dr. Balogh increased his venlafaxine, decreased his hydroxyzine prescription, and added lorazepam. Tr. 1820. [Plaintiff] saw Dr. Balogh again in July 2019 and discontinued his prescription for hydroxyzine, noting improvement. Tr. 1831. In September 2019, Dr. Balogh discontinued his prescription for Benztropine and added Amantadine. Tr. 1840.

> In February 2020, Dr. Balogh noted [Plaintiff] was stable with his medications and discontinued benztropine. Tr. 2008. [Plaintiff] continued taking Venlafaxine, Rexulti, Lorazepam, Celexa, and Amantadine. Id. [Plaintiff] continued to do well with this medication regime throughout 2020 and Dr. Balogh reported overall stable moods with occasional anxiety flare ups. Tr. 2003, 2013, 2071, 2091. In June of 2020 Mr. Sheet's was admitted to the emergency department for a panic attack. Tr. 2108.

(Pl's Statement of Specific Errors (ECF No. 8) at pp. 3-6.)

## III.   ADMINISTRATIVE DECISION

On September 28, 2021, the ALJ issued her decision. (R. at 256-87.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2021. (R. at 263.) At step one of the sequential evaluation process,[4] the ALJ found that Plaintiff engaged in substantial gainful activity during the third quarter of 2020. (*Id.*) However, there has been a continuous 12-month period(s) during which Plaintiff did not engage in substantial gainful activity. (*Id.*) The ALJ found that Plaintiff has the following severe impairments: affective

---

[4] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

disorder/depressive disorder, anxiety disorder, schizoaffective disorder, borderline intellectual functioning, obstructive sleep apnea, parasomnia, edema, bipolar disorder, and status/post - implantation of a cardiac loop recorder, secondary to syncope. (R. at 263.) The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 264.)

Before proceeding to Step Four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the [ALJ] finds that [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he is limited to performing simple, routine tasks, but he should avoid fast-paced work or work with strict production quotas; he could tolerate occasional changes and occasional decision-making; he should avoid interactions with the public; he could tolerate occasional but superficial interactions with coworkers and supervisors, with superficial being defined as that which is beyond the performance of job duties and job functions for specific purpose and a short duration; he should avoid tandem work; he should avoid work requiring the use of math computation skills, or the use of conflict resolution or management skills; and he would be off task for a total of 15 min of the workday, occurring in increments of 2 - 3 minutes at a time.

(R. at 267.)

At step four of the sequential process, the ALJ determined that Plaintiff is capable of performing his past relevant work as a stores laborer and as an industrial cleaner. This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity. (R. at 275-77.) Relying on the VE's testimony, the ALJ concluded at Step 5 that Plaintiff can perform other jobs that exist in significant numbers in the national economy. (R.

at 277-78.) She therefore concluded that Plaintiff has not been under a disability since October 18, 2013. (R. at 278.)

## IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that

error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V. ANALYSIS

In his Statement of Errors, Plaintiff asserts that the ALJ's RFC was not based on substantial evidence because it failed to properly account for key limitations opined by consultative psychologist, Gregory Johnson, Ph.D.; treating psychologist, Gary Wolfgang, Ph.D.; and treating physician, Roger Balogh, M.D. (ECF No. 8 at PageID 2497-2504). Plaintiff also argues that the RFC is inaccurate because the ALJ incorrectly defined superficial. (*Id.* at 2505-06). The Commissioner contends that the ALJ properly considered the medical opinions pursuant to the regulations. In addition, the Commissioner maintains that the ALJ properly considered the state agency psychologists' opinions and gave them some weight when formulating the residual functional capacity finding. The Commissioner also counters that the ALJ adequately defined the term superficial in her residual functional capacity based on the evidence of record. (ECF No. 10 at PageID 2513-21.)

Plaintiff's primary assignment of error is that the ALJ improperly evaluated opinion evidence throughout the record. (ECF No. 8 at PageID 2497-2504). Plaintiff generally takes issue with the ALJ's decision to give only partial weight to the opinions provided by Dr. Johnson and Dr. Wolfgang and only some weight to Dr. Balogh's opinion. (*Id.*) The Undersigned agrees and concludes that the ALJ failed to adhere to proper procedural requirements and did not provide good reasons for discounting Plaintiff's treating physicians.[5]

---

[5] This finding obviates the need for in depth analysis of Plaintiff's remaining assignments of error. Thus, the undersigned need not, and does not, resolve the alternative bases Plaintiff

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 404.1527(c).[6] ("Regardless of its source, we will evaluate every medical opinion we receive."). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1) ; *see also* SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.").

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 404.1527(c)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, then the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling

---

asserts support reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

[6] Plaintiff filed his application on February 29, 2016, before the revisions to the controlling regulations. Therefore, the analysis is governed by 20 C.R.R. § 404.1527.

weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*.

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed [Plaintiff] as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ expressly consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010)

15

(indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision). Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d)(2); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Against that backdrop, the ALJ provided the following discussion and analysis of Dr. Johnson's opinion, although Dr. Johnson was not a treating physician:

> \*\*\* [Dr. Johnson] evaluated [Plaintiff] on November 30, 2016 and diagnosed him with Schizophrenia and Borderline Intellectual Functioning. Dr. Johnson opined that [Plaintiff] has a somewhat elevated risk for dysfunction in carrying out instructions given to him in the workplace to completion, and elevated risk for dysfunction in maintaining persistence and pace in both simple and multistep tasks in the workplace, an elevated risk for inappropriate responses to expected interactions with coworkers and to expected scrutiny from supervisors, and he opined [Plaintiff] has an elevated risk for inappropriate responses to expected workplace pressures (Id. at 7). Accordingly, ***the undersigned assigns partial weight the consultative examiner's opinion, to the extent that said limitations support the mental limitations found within the above-stated RFC, as said opinion is generally consistent with and supported by the totality of record***, which documents a history of conservative care for [Plaintiff]'s mental health impairments. Moreover, the undersigned notes that the evidence of record fails to document recovering emergency care inpatient hospitalizations for mental health impairments.

(R. at 273 (internal citations omitted) (emphasis added).)

The ALJ provided the following discussion and analysis of treating psychologist, Dr. Wolfgang's opinions:

16

> *** [O]n September 24, 2017, [Dr. Wolfgang] opined that [Plaintiff] is unable to meet competitive standards in a number of areas regarding the mental abilities and aptitudes needed to do unskilled, semi-skilled and skilled work, and particular job types. Moreover, Dr. Wolfgang opined [Plaintiff] would be absent from work about one day per month, due to his impairments or treatment. Accordingly, ***the undersigned assigns partial weight to Dr. Wolfgang's opinion, as said opinion is generally consistent with and supported by the totality of the record, to the extent that said limitations are consistent with the mental limitations found within the above-stated RFC***. The [ALJ] notes that the above stated RFC limits the nature, complexity, and pace of [Plaintiff]'s work activities and the nature and frequency of his interactions with others in the workplace, due to the combined effects of his mental impairments.

(R. at 273 (internal citations omitted) (emphasis added).)

> Additionally, the undersigned considered the opinion of Gary Wolfgang, PhD, a treating psychologist, who performed psychological evaluations in August and October 2017, and he diagnosed [Plaintiff] with Schizoaffective Disorder (C24F). During the evaluation, [Plaintiff] was assessed with a Full-scale IQ score of 65, placing him in the mid-range of intellectual impairment (Id. at 7). Dr. Wolfgang opined that the results of the current evaluation suggest the presence of psychopathology in multiple areas, as [Plaintiff]'s behavior, verbal description of his symptoms, and history would suggest disorders of both thought and mood (Id. at 8). Accordingly, ***the undersigned assigns some weight to Dr. Wolfgang's opinion, as said opinion is generally consistent with and supported by the totality of the record, to the extent that his clinical findings support the mental limitations found within the above-stated RFC,*** *due* to the combined effects of [Plaintiff]'s severe mental impairments. However, the undersigned finds that the probative value of Dr. Wolfgang's opinion is limited, as he failed to provide a function-by-function analysis of limitations resulting from [Plaintiff]'s mental conditions.

(R. at 274 (internal citations omitted) (emphasis added).)

The ALJ provided the following discussion and analysis of Dr. Balogh's opinion:

17

> \*\*\* Dr. Roger Balogh, a treating source, who completed a mental health opinion form on June 12, 2018 \*\*\* opined that [Plaintiff] was seriously limited or unable to meet competitive standards in a number of areas regarding the mental abilities and aptitudes needed to do unskilled, semi-skilled and skilled work, and particular job types. Additionally, he opined that [Plaintiff] would be absent from work more than 4 days per month, due to his impairments or treatment. Accordingly, ***the [ALJ] assigns some weight to Dr. Balogh's opinion, as said opinion is somewhat consistent with and supported by the totality of the record***, which documents significant social interaction difficulties and interpersonal deficiencies, as discussed above.

(R. at 273 (internal citations omitted) (emphasis added).)

A lengthy analysis is not warranted.  Here, the ALJ utterly failed to adhere to the procedural requirement to discuss the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source in determining what weight to give the opinion as required by the appropriate regulations and caselaw.  *See Friend*, 375 F. App'x at 550.  The ALJ provided no reasons, let alone good reasons for discounting Plaintiff's treating physicians' opinions.  This omission constitutes reversable error because the ALJ's reasoning is not sufficiently specific to make clear to the Court the weight the she gave to the treating source's medical opinion and the reasons for that weight.  *See id.*

Moreover, the ALJ erred by essentially finding the medical opinions of record to be credible and assigning weight only to the extent that they were consistent with the ALJ's predetermined RFC.  As the above passages reveal, the ALJ specifically concluded that the weight she was assigning to a medical opinion depended on whether the opinion was consistent the RFC she had already crafted.  The ALJ in essence put the cart before the horse.  The ALJ is supposed to create the RFC based on the evidence of record, not the other way around.  This too is reversable

18

error. *See Greene v. Berryhill*, Case No. 3:16-cv-46, 2017 WL 959295 at *2 (S.D. Oh. March 10, 2017) (noting an ALJ's formulation of RFC first and then evaluating a treating source's opinion against it is a "cart before the horse" approach that would constitute reversible error.

VI.     **CONCLUSION**

For these reasons, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors be **SUSTAINED,** that the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** under Sentence Four of § 405(g).

VII.    **PROCEDURE ON OBJECTIONS**

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report an\d Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g., Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005) (holding that

19

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:   August 7, 2023                                               /s/ *Elizabeth A. Preston Deavers*
                                                                                            Elizabeth A. Preston Deavers
                                                                                            United States Magistrate Judge